# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

ANDREW MAXWELL,          )
                                      )
            **Petitioner,**     )
                                        )
v.                                  )        **Case No. 3:08-cv-254-RJC**
                                        )
KRISTINA MAXWELL,       )
                                        )
            **Respondent.**    )
                                        )

## MEMORANDUM OF DECISION

On June 5, 2008, Andrew Maxwell, an Australian citizen, seeking the return of his four-year-old quadruplet Children[1] to Australia, filed suit in this Court against his estranged wife, Kristina Maxwell, a U.S. citizen, under the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 et seq. The Act, implementing the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980) (to which both the United States and Australia are signatories) enables a person whose child has been wrongfully removed to the United States in violation of the Hague Convention to sue the alleged wrongdoer in federal court for the return of the child. 42 U.S.C. § 11603(b). Here, Andrew alleges that Kristina removed the Children from Australia to the United States without his consent on February 6, 2008, and has since then wrongfully retained them in North Carolina.

On July 31, 2008, the Court conducted an evidentiary hearing to resolve the merits of the Petition. The next day, the Court issued a summary order denying Andrew's Petition on the grounds

---

[1] The Court will simply refer to them as "the Children."

that he has proved neither that the Children's habitual residence was Australia, nor that the removal and retention were wrongful (i.e., in violation of Andrew's rights of custody under Australian Law). Hague Convention, Art. 3(a); 42 U.S.C.§ 11603(e)(1)(A). (Doc. No. 22).[2] Now, pursuant to Federal Rule of Civil Procedure 52, the Court issues the following memorandum of its specific findings of fact and conclusions of law, and order entering judgment for the Respondent.

## I . FINDINGS OF FACT

The Court notes that some of the testimony and evidence involves facts on which the parties agree, or disputed facts that turn out not to be crucial to the decision, thus not requiring a determination. Other facts, however, are the subject of sharp disagreement, including those facts necessary to resolve the dispute. As to those facts the Court is required to make certain findings specially. Fed. R. Civ. P. 52(a).

In making its findings, the Court has reviewed the record in its entirety; and it has had the opportunity to observe the witnesses presented at the hearing, assess their credibility and weigh their testimony. Broadly speaking, based on the testimony that has been presented, the Court finds that the Respondent's version of the events described below should be credited and the Petitioner, who has the burden of proof, has failed to sustain that burden because his version should not be credited. In particular, the Court finds that the record supports the Respondent's claim that the move to Australia was conditional before and subsequent to her arrival abroad. The Court further finds that the testimony of Gabrielle Beando ("Gabi"), Kristina's teenage daughter from a previous marriage, was convincing and corroborative of her mother's testimony. Conversely, the Court finds that the

---

[2] As the Court concluded that the Petition has failed to establish a prima facie case for the children's return to Australia by a preponderance of the evidence, it is unnecessary for the Court to discuss the "grave risk exception."

Petitioner's credibility was undercut by: (1) several instances in which he misrepresented facts in his Petition[3] or seemingly contradicted his own testimony[4]; and (2) his singular intention, perhaps beginning as early as July 2007,[5] to gain permanent custody of the Children in Australia,[6] followed by his repeated steps to prevent Kristina from leaving Australia with the Children, demonstrated most notably by his confiscation of the Children's passports so she could not leave.[7]

To the extent that there may be otherwise uncontradicted evidence mentioned in the record not explicitly addressed in this Memorandum, including various sworn statements from the Petitioner, the Court makes no findings with respect to that evidence.

---

[3] (For example, compare Pet. Aff., ¶¶ 41-2 ("[I] call[ed] to have the children immediately placed on the do not fly list. The order was granted. I later received a telephone call from the Federal Police who said words to the effect of, "[t]he children left the country 45 minutes before the order was granted.") with Petition, ¶ 26 ("Notwithstanding such order, respondent left Australia with the Children"), Pet. Trial Br., p. 2 ("[R]espondent covertly left Australia with the Children contemporaneously with the issuance of an order of the Family Court of Australia restraining her from doing so.") and Tr., 124:4-125:12 (Q: "But the plain fact of the matter is, you did not obtain this order until Ms. Maxwell was already gone . . . ." A: "Possibly, yeah."); also compare Pet. Hr'g Exh. 2: Application for Return of Children, p. 5 ("My lawyer in the USA, Alan Krusch, advised me that as soon as Kristina and I were living together again these orders *would be void*." (emphasis added)) with Pet. Hr'g Exh. 6: Letter from Alan Krusch ([I]f you reconcile and resume your relationship (basically if she moves there and you start living together again), it is *likely* that the custody order will terminate." (emphasis added)).

[4] Most notable was his vague and ultimately unconvincing explanations for why he retained the Children's passports. (Compare Tr., 119:22-24 (Q: "You were worried that she was going to leave. You knew she wanted to leave." A: "I didn't believe that she would go.") with Tr., 117:22-118: 6 (Q: "And the reason you [placed your children on the Passport Alert Program] is because you were holding on to the original passports that the children had when Ms. Maxwell had before she traveled to Australia, right?" A: "They were my passports to hold. She was forging documents. She was forging passport admissions."); 119:6-21 (Q: "[A]s of January 18, 40 days after your children and Ms. Maxwell had been in Australia, you were worried that they were leaving?" A: "I was worried when her medication was running out. . . . I was worried for the safety of my children."); and 121:5-12 (Q: "And Ms. Maxwell asked you on multiple occasions after the twenty-first, to return the passports, didn't she?" A: "Yes, she did. . . . And I told her I had no intentions of doing that. . . . They were my passports, and I had a right to hold them, under Australian law.")).

[5] (See *infra*, n. 8).

[6] (See, Pet. Aff., ¶ 8 ("[I] agreed [to the consent custody order] as this was the only way to get my kids here and to keep them safe. . . . My lawyer in the USA [] advised me that as soon as Kristina and I were living together again these orders would be void."); discussion *infra*, n.11); see also Tr., 95:1-7 (Q: "Did she tell you why she wanted you – did she tell you what she wanted you to do at the solicitor's office?" A: "Well she wanted to discuss an arrangement with the children. It was my belief that the arrangement would concern the kids coming here without her, in June to August. That was my sort of – she wanted to make a deal, so to speak. In which I wasn't interested in that.")).

Andrew's misuse of the legal system to gain custody of the Children continued after Kristina left Australia. (See Pet. Hr'g Exhs. 57, 58 (discussed *infra*, n.64)).

[7] (See discussion *infra*, p. 11).

## A. Background

Kristina and Andrew met and married in Australia in 1999, but moved shortly thereafter to Massachusetts where, on January 18, 2004, Kristina gave birth to their quadruplets.

The couple was first estranged in December 2005, when Andrew returned to Australia, and Kristina and the Children moved to Charlotte, North Carolina, to live with Kristina's mother. By June 2006, Kristina had filed for divorce in Massachusetts. Andrew thereafter initiated a custody action in North Carolina.[8]

In August 2007, Andrew traveled to North Carolina to attend a custody hearing. In a mood of temporary reconciliation, the Maxwells discontinued their divorce action[9] and signed a Memorandum of Judgment that gave Kristina permanent, sole custody of the Children, the provisions of which were later incorporated into a revised, formal Consent Order.[10]

---

[8] As part of his pursuit of custody, in June 2007, Andrew registered the Children as Australian citizens by descent. (See Pet. Application, Exhs. H-K.) The Children thus appear to be dual U.S.-Australian citizens.

[9] (See Pet. Hr'g Exh. 5).

[10] The Memorandum of Judgment (Resp. Hr'g Exh. 3) was signed on August 16, 2007, by the parties, their counsel and the presiding judge, and filed in the Superior Court of Mecklenburg County, North Carolina. The Consent Order (Resp. Hr'g Exh. 4), as entered by the court on October 25, 2007, provided, *inter alia,* that:

> 1.  [The Mother] is a fit and proper person to have the permanent care, custody and control of the parties' minor children and it is in the best interests of the minor children that their permanent care, custody and control be placed with their mother . . . subject to visitation with [the Father] as hereinafter ordered.
>
> 2.  The Father is a fit and proper person to exercise visitation with the minor [Children].

And:

> 1.  The permanent care, custody and control of the minor children [] shall be placed with their [M]other . . . subject to visitation with [their Father] as hereinafter ordered. [The Mother] shall confer with [the father] on all decisions regarding the health[,] education, religion and welfare of the children. [The Father] shall be allowed input into all major decisions regarding the children.
>
> 3.  [The Father] shall be allowed unrestricted telephone access with the children. [The Mother] shall assist in the communication between [the Father] and the children. Both parties shall have access to all school and medical records, as well as access to all teachers, doctors, dentists, etc. The [Mother] shall provide [Father] with copies of all

Having illusively[11] settled the issue of custody Andrew returned home, and he and Kristina

continued to discuss a full reconciliation in Australia. Both had doubts. In particular, Kristina had

an uneasy suspicion that Andrew was using their putative reconciliation to gain custody of the

Children.[12] (For this reason, she registered the both the Memorandum of Judgment and the Consent

Order with the Family Court of Australia as soon as possible.[13]) Kristina was also concerned about

Andrew's relationship with his girlfriend Maryanne Land.[14] For Andrew, it was "trust but verify";

he had Kristina give him her e-mail and cell-phone passwords to make sure that she had broken-up

with her male friend Derek Otten before he broke-up with Ms. Land. [15]

---

medical records, report cards, school process reports and the like. Each party shall keep
the other informed of any emergency involving [the other] or the minor children. The party
with knowledge of the event shall inform the other as soon as possible following the event.

4.      [The Father] shall be entitled to visitation with the minor children as follows.

A.      Summer: [The Mother] and the children shall travel to Australia each year during
[] summer vacation in the school district in which they reside . . . . [The Father]
shall pay for the round trip airplane tickets for [the Mother] and the children and
shall provide housing for the defendant and the children during their stay in
Australia. . . . [The Father] will do nothing to prevent [the mother] and the
children from returning to America at the designated time."

B.      [The Father] shall be allowed unlimited visitation with the minor children when
he travels to see them in the United States. When he travels to the U.S. he shall
be allowed to stay with the defendant at her residence.

[11] Andrew concedes that he he agreed to the custody order principally because he believed the order would be
void in Australia. (See Pet. Aff., ¶ 8; Tr., 17:22-18:3; 100:11-13,17-21). Indeed, in his own words, Andrew viewed the
Consent Order as "a bit of paper that [didn't] possess a problem." (Tr., 18:5-8; see also Tr., 96:22-24 ("But there was
more involved than a piece of paper."); Tr., 100:20-24 ("[T]hat court order would be invalid any way. I wasn't relying
on a bit of paper. I wanted to salvage my marriage.")).

[12] Kristina credibly testified (without rebuttal from Andrew) that her suspicions were first aroused during the
custody proceedings when Andrew mentioned that "the Hague Convention would protect [her]." (See Tr., 168:7-25);
(Resp. Exh. 2: e-mail from Ms. Land to Kristina, dated August 28, 2007 ("The only reason Andrew tolerates you is for
his Children. . . . Andrew will NEVER give up until he has his kids away from you. . . . If he fails, he will try again and
again and again and again.") (emphasis in original)).

[13] (See Tr., 197: 21-6; Resp. Exh. 3). Kristina registered the Memorandum of Judgment in the Family Court
of Australia on September 9, 2007 (registration was completed on September 26, 2007), and the final Consent Order on
December 18, 2007 (registration was completed on December 24, 2007).

[14] (See Tr., 165:8-18; Resp. Aff., Exh. 2).

[15] (See Tr., 12:22-13:11; 14:22-15:3). To the extent that it is ambiguous whether Andrew claims Kristina

Nevertheless, as Samuel Johnson once observed, hope does sometimes triumph over experience. Kristina agreed to give the marriage "one last shot," agreeing that in November she would go to Australia with the Children and her daughter Gabi.

## B. Disputed Facts

Both sides dispute the actual purpose of the move. Kristina asserts that she intended it to be a trial reconciliation only.[16] Andrew denies that they ever agreed that it was a trial,[17] although he admits that "[Kristina] came here to work on our marriage."[18] The most objective evidence of Kristina's early intentions in the beginning is an e-mail she sent to her friends on September 7, 2007:

> [T]he kids (including Gabi) and I are moving to Australia so that Andrew and I have one last chance to put our marriage and family back together . . . .We both have decided to put away the past and want to try move forward. We dismissed the divorce [] and plan to do whatever it takes to start the next phase of our marriage with no history or past, just a clean slate . . . . I know God is always guiding us and if it is in His plan for us to be a family again, things will work out the way we hope they will."[19]

offered to give him her passwords, the Court finds that Kristina is more credible as to who first asked for them. (See Tr., 107: 9-13; 109:19-23; 151:1-5; 163:6-10 ("[H]e asked me for my passwords to my "Ilovemyquads" [hotmail] account and Yahoo account and for my cell-phone. I provided [them].")).

Andrew disputes Kristina's testimony that she did not give him her G-mail account password. (See Tr., 113:7-9 (Q: "And Ms. Maxwell never gave you the password to her G-mail account; isn't that right? A: "She gave me the passwords to all her accounts.")). The Court, however, finds Kristina's testimony more credible on this point. (See Tr., 170:25-171:5 ("I gave him passwords to my Yahoo account, "Ilovemyquads" and "Quadmommy," both at Hotmail, [but not to] my G-mail account, ever.")). In addition to the observed demeanor of the witnesses, the Court finds that the very personal nature of many of the e-mails sent and received at that address inferentially supports Kristina's version. (See, e.g., Pet. Hr'g Exh. 21: e-mail from Kristina to Kathy Barber ("The worst part is, I canNOT let Andrew know I'm on meds. . . . I will have to HIDE the medicine so he doesn't find it or know I'm taking it. . . . I can't let him know anything about my mental status . . .because if [the is just an attempt to get the kids, I'm not handing him that kind of ammunition.") (emphasis in original)).

[16] (See Tr., 150:17 ("We decided that we would give it one last shot."); Tr., 151:6-16 (Q: "When you say that you agreed to go to Australia on a trial basis, what did you mean and what did you intend?" A: "I meant that he had three months to prove to me that what he was saying was true. That he was a better man than he had ever been. That we would have a wonderful life. And that this is our last chance to pull our family together.")).

[17] (See Tr., 102:22-35 (Q: "First of all, Kristina only agreed to go to Australia on a trial basis for no more than a three month period; isn't that correct?" A: "No, it's not true at all. Not anywhere near close to true."); 106:25-107:1 ("She didn't come here on a three month trial period either."); 119:5 ("It was never a trial period.")).

[18] (See Tr., 102:12-14).

[19] (See Pet. Hr'g Exh. 8).

In the beginning, Kristina was "positive and enthusiastic" about the move.[20] Throughout September she and Andrew communicated frequently.[21] Kristina collected the information necessary for her and Gabi to apply for permanent residency, and gave Andrew permission to obtain Australian passports for the Children.[22] Kristina also helped Andrew look for a house[23] and buy a seven-seater Kia van.[24] She briefly looked for employment as a licensed practical nurse[25] and explored programs in information technology and bartending/mixology.[26] Kristina also told numerous people that she was moving to Australia with permanent residency.[27]

Kristina, however, grew doubtful about reconciliation. Besides her uneasy suspicion that Andrew was using the trip to get custody of the Children, Kristina was unhappy that Andrew still had contact with Maryanne Land.[28] And the couple's tight finances were not helping.[29] Although

---

[20] (Resp. Aff., ¶10).

[21] (See, e.g., Pet. Hr'g Exhs. 7,11).

[22] (See Pet. Hr'g Exh. 30). But presumably this was necessary for the Children to travel to Australia for any reason, including a temporary stay. Australian citizens are required to hold Australian passports to enter or leave Australia. See the Australian Government's Department of Immigration and Citizenship ("DIAC") website, http://www.immi.gov.au/media/fact-sheets/95documents.htm (last visited Aug. 11, 2008).

[23] (See Pet. Hr'g Exh. 10). Andrew eventually rented a house, on a six-month lease in his name only, in Gymea, New South Wales. The Maxwells discussed buying a house in Wollongong, approximately 60 miles away, after the lease expired, to be near his parents. (See Tr., 78:11-16).

[24] (See Tr., 25:1-26:13; Pet. Aff., Exh. 9).

[25] (See Pet. Aff., Exh. 10). In particular, on September 12, 2007, Kristina e-mailed HealthStaff Recruitment (an Australian healthcare placement agency) inquiring whether her degree as a LPN was comparable in Australia to being an "enrolled nurse." Kristina also obtained letters of reference from her former employer.

[26] (See Pet. Hr'g Exh. 9). Initially, Kristina had wanted to move to Australia after she completed a two-year program in information technology she had enrolled in at the Art Institute of Charlotte. But she later cancelled her enrollment and agreed to move within six months. (See Tr., 30:12-31:9; 259:16-262:10; Pet. Hr'g Exh. 9: e-mail from Kristina to TAFE, NSW, dated September 12, 2007). Those traveling on a tourist visa can enroll in part-time in "TAFE" (Technical and Further Education) schools, although Kristina never explored these opportunities once she arrived in Australia.

[27] (See, e.g., Pet. Hr'g Exhs. 8, 9).

[28] (See, e.g., Pet. Hr'g Exh. 26 ("I just don't understand why I tell you how I feel about you seeing MA but you still do and feel perfectly justified in doing it[.]")). Kristina was especially upset that Ms. Land co-signed the loan for the Kia Andrew purchased. (See Tr., 176:1-16; see also Tr., 24:12-25 (Andrew's explanation)).

[29] (See, e.g., Pet. Hr'g Exhs. 31, 55).

Kristina eventually sold her beloved sewing machine and the Children's outdoor playset,[30] she and

Andrew argued over whether she should sell certain things or default on her car loan.[31] Thus, by

November, the lines of communication between Kristina and Andrew had broken down. As revealed

in a later e-mail:

> Andrew and I have been fighting when we talk but for the most part we don't talk at
> all. He's been [e-]mailing my mother going on about how I cheated on him . . .
> [W]e're not even there yet and already this crap has started again. I'm so
> psychologically on the verge of collapse, my doctor has me on 4 different meds . . .
> .I go to counseling every week and still I am getting worse, not better. The worst
> part, I canNOT let Andrew know that I'm on any meds and that causes a couple of
> problems. First, NC Medicaid will only fill a prescription for 30 days.[] [T]hat gives
> me 1 month of meds and that's it. Not to mention the fact I will have to HIDE the
> medicine so he doesn't find it or know I'm taking it. We won't have health insurance
> for 4 months (at least) so going to see a doctor and getting prescriptions there will not
> be an option. . . . I can't let him know anything about my mental status, diagnosis or
> treatment because if this is all just an attempt to get the kids, I'm not handing him
> that kind of ammunition . . . . The choice to "no go' is not a choice. I made a
> commitment and I intent to stick to it. About the only thing I'm sure of these days
> is that God will let me know pretty quickly whether or not the kids and I are in the
> right place. . . . We won't have health insurance for 4 months (at least). About the
> only thing I'm sure of these days is that God will let me know pretty quickly whether
> or not the kids and I are in the right place.[32]

By the time she obtained the tickets, Kristina had planned that she and the Children might

return to the United States. She bought herself, Gabi and the Children round-trips tickets leaving

for Australia on December 4, 2007, with a return flight on March 4, 2008,[33] with each person

---

[30] (See Pet. Hr'g Exh. 29; Tr., 20:14-20 ("She had a children's play set, a big play set in the backyard, she sold that. . . . She had a sewing machine, which was like, that was her baby . . . she sold that."); 159:13-170).

[31] (See Resp. Aff., ¶15 ("Petitioner ultimately stated that he felt like I was making sure we could just 'walk right back into our lives' in Charlotte and I told him that was exactly what we would do."); Pet. Hr'g Exh. 55 (discussing whether Kristina could sell "her" piano); Tr., 157:19-158:5 ("He wanted me to default on my loan and have it repossessed."); 293:1-5 ("He started pushing about getting rid of my car. He started pushing about me getting rid of everything I owned.")). That Kristina lied to Andrew about whether she sold her computer and van (see Tr., 129:16-130:7) is evidence of a breakdown in communication.

[32] (Pet. Hr'g Exh. 21 (emphasis in original). At the hearing, Kristina confirmed that she had sent that e-mail to Kathy Barber. (See Tr., 169:11-172:5).

[33] (See Pet. Hr'g Exh. 23). According to Andrew, he gave Kristina money for the tickets, although she made the reservation herself. (See Tr., 103:1-20).

8

traveling on an Electronic Travel Authority ("ETA").[34]  Before leaving, Kristina made certain that

Gabi could resume school at Carmel Christian in March.[35]  Kristina also, *inter alia*, kept her cell-

phone account, bank account and North Carolina Medicare insurance, and maintained the lease and

insurance on her car.[36]

    Kristina, Gabi, and the Children flew to Australia on December 6, 2007, bringing with them

ten suitcases containing photographs of the family, jewelry and perfume; bedding, blankets, linen,

household cutlery, dishes, pots and pans, bike helmets; portable DVD players that could be used in

Australia; one month of prescription medication for Kristina; summer clothing; Andrew's power

tools and flashlights[37] and the Children's and Gabi's medical records and immunization records, as

well as Gabi's school records.[38]

    The reconciliation was short lived.  During her Kristina's stay, she and Andrew argued

---

[34] According to the Australian Department of Immigration and Citizenship ("DIAC") website, an ETA is equivalent to a visa, but there is no stamp in the passport and applications for ETAs can be submitted through travel agents or airlines, rather than through an Australian diplomatic office. See Australian Electronic Travel Authority, http://www.eta.immi.gov.au/ETAAus2En.html (lasted visited Aug. 10, 2008). The ETA is designed for those persons traveling for tourism or to visit friends or relatives. It is valid for 12 months with stays of up to 3 months on each visit, and can be used for single or multiple entry travel.  The Court notes that unaddressed by the parties is how the Children, who are dual U.S.-Australian citizens were able to obtain an ETA or any sort of Visa. http://www.immi.gov.au/media/fact-sheets/95documents.htm (last visited Aug. 12, 2008).

[35] Both Kristina and Gabi testified without rebuttal on this point. (See Tr., 155:13-156:1; 299:1-8). Gabi, however, did not return to Carmel Christian in March.  After Kristina left on February 6, Andrew sent an e-mail to everyone in Kristina's G-mail address book s alleging, *inter alia*, that Gabi was cutting herself.  Kristina credibly testified without rebuttal that once the school learned of that behavior, among other things, it did not allow Gabi return. (See Tr., 156:2-22).

[36] (See Tr., 158:7-159:7).

[37] (See Tr., 34:23-35:2).

[38] Andrew alleges that Kristina brought 14 suitcases plus carry-on, and packed winter clothes, baby-memorabilia, and framed photographs (see Tr., 32:12-33:17; Pet. ¶22); (see also Petition, ¶19(n) ("Respondent packed up "everything I own."")).  The Court finds unhelpful the Petitioner's selective quotation from an email that Kristina sent Andrew on September 8, 2007 (see Pet. Exh. 4 ("I'm not packing up everything I own and dragging the kids halfway around the world for a joke.") (emphasis added)).  It certainly is not evidence that Kristina in fact sold all her personal items and packed "everything [she] own[ed]."  The Court, rather, finds Kristina's account more credible. (See Tr., 166:1-168:3; see also Tr., 298:15-25 (Gabi's unrebutted testimony that she did not pack summer clothing)).

frequently.[39]   Andrew sometimes was violent towards her,[40] and he threatened both to kick her out

of the house and to have her arrested (allegedly, some of the prescription medicine Kristina brought

from home was illegal in Australia).[41]   And the couples' trust issues persisted.[42]  (As Kristina

discovered much later, Andrew also installed "eBlaster" spyware on the family computer.[43])

After approximately three weeks, Andrew asked Kristina if she would stay in Australia even

---

[39] (See Resp. Hr'g Exh. 15: e-mail from Kristina to Andrew on the morning of January 14, 2008 ("The fact is, I [don't] have to stay here with the kids and that's what scares you. Why aren't you smart enough to do something about it other than holding the passports at your job? . . . My preference is that you, for once, have a little faith in not just me but our family?") and Exh. 14: responsive e-mail from Andrew to Kristina sent that same evening ("You want to start this 'I hate Andrew to my family[?]' [T]hen get your shit and piss off, or I will move out."); Resp. Hr'g Exh. 31: e-mail exchange between Kristina and Andrew, dated December 31, 2007); Tr., 52:13-53:5 ("[We] had arguments with how she was treating the kids.  [We] had arguments about the names on the prescription bottles."); 108:10-13 (Q: "And you fought and argued after Ms. Maxwell arrived in December; isn't that right?"  A: "We always had arguments. You know, no marriage is perfect. We had a lot of things to work out.")).

[40] Andrew denies ever hitting or threatening Kristina. (See Tr., 140:18-22 (Q: "Isn't it true that during Ms. Maxwell's brief stay in Australia, you repeatedly would come up to her, hit her on the arm and tell her in front of the children, that you ought to beat the blank out of her?" A: "No, that's not true.").  The Court, however, finds credible Kristina's allegations that Andrew was violent towards her. (See Tr., 209:24-210:1). Gabi's testimony was especially credible on this point. (See Tr., 300:9-11 ("Well, whenever mom would be like sitting there, he would come up to her and he would punch her in the arm and say, I should beat the blank out of you.")).

[41] (See Tr., 116:9-117:2 (Q: "Didn't you tell her to pack up her crap and get out?"  A: "Yeah, out of the house or I leave."); 192:8-21 ("[E]very other day, he would say, do you want me to call the police. . . . [Y]ou'll be living in the street.  Do you want me to have you arrested?"); 290:2-8 (same)).

[42] (See Tr., 117: 2-4 ("I found out that [Kristina] was sending code messages to a lover in Massachusetts."); Pet. Hr'g Exh. 32: e-mail from Kristina to her mother, dated January 18, 2008 ("Please keep looking [Mom]. [] [Y]ou know he's never going to believe me if I tell him it's not there or that you can't find [the marriage certificate].") and Exh. 52: e-mail from Kristina to her Mother, dated January 21, 2008 ("Can you send Andrew back the email I sent you asking for the marriage certificate?  Don't ask why, just please do it for me. [T]hanks Mom."); Resp. Hr'g Exh. 31: e-mail exchange between Kristina and Andrew, dated December 31, 2007 ("You [Andrew] need to tell me exactly what reasons you're pushing pre-school for. . . . And don't give me the line of bull about my needing a break . . . you don't know what I need. So what exactly is this about?")).

[43] Once installed, eBlaster surreptitiously sends copies of every e-mail sent and received on that computer, plus complete reports of internet chats, instant messages, web sites visited and keystrokes typed, to the computer administrator's e-mail address.  In particular, e-mails are forwarded with the designation "eblaster on [original e-mail title]" listed in the "from" line. See eBlaster Spy Software, http://www.eblaster.com (last visited on Aug. 29, 2008).
   Andrew contends that Kristina was aware of this software and that it was used only to track Gabi's internet usage. (See Tr., 109:6-12).  While Kristina may have been aware that there was some form of spyware on the computer, based on its assessment of both parties' demeanor during the hearing, the Court finds Kristina's testimony that she was unaware that Andrew was receiving her mails via eBlaster more credible. (See Tr., 170:18-22).  Both the very personal nature of the e-mails forwarded by eBlaster (see discussion *supra*, n.15), including one e-mail that Kristina had sent before her arrival in Australia, and Andrew's malicious use of Kristina's e-mail on two other occasions (see Resp. Aff. Exhs. 2, 5), supports this conclusion.

if the marriage did not work out.[44]  When she said no, Andrew thereafter took a number of steps

designed to prevent Kristina from leaving Australia with the Children.  Most significantly, Andrew

took the Children's passports,[45] and, later on, Kristina's copies of the Custody Order, as well as

Kristina's and Gabi's passports (although he returned those).[46]  Later on, the day after Kristina spoke

with a solicitor about leaving, Andrew posed as Kristina in an e-mail attempt to have the custody

order lifted,[47] and then, two days later, placed the Children on the U.S. State Department's passport

alert program list.[48]  (Also, in an unsuccessful attempt to keep Kristina from soliciting legal advice,

Andrew ripped out the "solicitor" section of Yellow Pages and disabled Kristina's internet access

on the computer. [49])

On January 15, 2008, Kristina called solictor Peter Magee at Armstrong Legal.  She told him

---

[44] (See Resp. Aff. ¶ 49).

[45] Specifically, Andrew took the Children's passports on or about December 22, 2007, and kept them at his office.  When Kristina asked for them back, he said "I'm not bringing them back [from work], I'm not coming home one day and finding you gone." (See Tr., 185:19-186:3).  Although Andrew denied keeping the passports for this reason, for the reasons discussed previously, the Court finds Andrew's evasive version unconvincing. (See *supra*, n. 4).

[46] Both parties agree that they fought and that Andrew threatened to kick Kristina out. (See Resp. Hr'g Exh. 15: e-mail from Kristina to Andrew on the Morning of January 14, 2008 ("The fact is, I [don't] have to stay here with the kids and that's what scares you.  Why aren't you smart enough to do something about it other than holding the passports at your job? . . . My preference is that you, for once, have a little faith in not just me but our family?") and Exh. 14: responsive e-mail from Andrew to Kristina that evening ("You want to start this 'I hate Andrew to my family[?]' [T]hen get your shit and piss off, or I will move out."); see also Tr., 116:9-117:2 (Q: "Didn't you tell her to pack up her crap and get out?" A: "Yeah, out of the house or I leave."); 192:8-21; 290:2-8).

[47] (See Pet. Hr'g Exh. 51).  Both parties deny sending the e-mail. (See Tr., 142:12-143:7; 199:20-201:14).  Based on (1) its assessment of both parties' testimonial demeanor; (2) that it was Andrew who produced the e-mail, which did not indicate that it was forwarded by eBlaster; (3) its findings regarding Kristina's G-mail account and Andrew's use of spyware (see discussion, *supra* n. 15 and 43); (4) that Kristina had registered the Consent Order on December 24, 2007, and had sought legal advice on how to leave Australia the day before the e-mail was sent; (5) that Andrew's admitted goal of keeping the Children in Australia would be advanced and Kristina's custodial rights threatened (rights that Andrew contemptuously viewed as "a bit of paper that [didn't] possess a problem" (see Tr., 8:6-7, discussed *supra,* n.6); and (6) Andrew's malicious use of Kristina's e-mail on other occasions (see Resp. Aff. Exhs. 2, 5), the Court finds that its inference is well-supported by the record.

[48] (See Pet. Aff., ¶29, Exh. U).  Under the program, parents can ask the embassy to notify them if the other parent seeks a passport for their child.  The parent can try to show a passport should not issue. See 22 C.F.R. § 51.28(c)(1); see also U.S. Department of State, The Children's Passport Issuance Alert Program, http:/ /travel. state. gov /family /abduction /resources/resources_554.html (last visited Aug. 12, 2008).

[49] (See Resp. Hr'g Exh. 2A; Tr., 191:20-24).  Andrew's denial of this (see Tr., 123:16-124:1) is unconvincing.

that her husband had taken the Children's passports and that she wanted to go home.[50]  Mr. Magee

told her that her best option was to ask the embassy for interim passports; or (the more expensive

option) she could seek a court order returning the passports.[51]  Neither was possible at the time:

generally both parents need to execute an application for a passport[52]; and a court order was too

expensive.

Unable to leave immediately, Kristina thereafter filled out the permanent residency

application for herself and Gabi,[53] going so far as to ask her mother to send the Children's birth

certificates and her marriage certificate when she could not find them.[54]  Kristina filled out the

paperwork to enroll Gabi in school, and the Children in preschool and a YMCA Gymnastics

program.[55]  The Maxwells even attending marriage counseling.[56]  Kristina plausibly explained that

she did these things only because she felt that she had no choice after Andrew had continually

---

[50] (See Tr., 220:18-221:3 ("She expressed to me at the time that there [were] difficulties in her marriage.  She had only recently traveled to Australia from the U.S., and that she no longer wished to stay in Australia. Her husband had control of her passports and she didn't know how she was going to leave.  She found the relationship to be toxic or difficult."); 237:7-19 (same)).

[51] (See Tr., 194:11-195:3; 236:6-237:2).

[52] The Court specifically finds Kristina's testimony credible on this point. (See Tr., 194:11-195:22).  Indeed, except as specifically provided for in the Code of Federal Regulations, both parents must execute an application for, or renewal of, a passport if the child is under the age of sixteen. 22 C.F.R. § 51.28(a)(2).  Some exceptions exist, such as if one parent provides evidence that she has sole custody of the child, id. § 51.28(a)(3)(ii)(E), or if there are "exigent or special family circumstances," id., § 51.28(a)(5). The Department of State can deny a passport if a court order grants sole custody to the objecting parent, establishes joint legal custody, or prohibits the child's travel without the permission of the court or both parents. Id., § 51.28(a)(3)(ii)(G).

[53] (See Pet. Hr'g Exh. 13; Tr., 273:11-276:1).  In filling out the application, Kristina wrote that the purpose of her and Gabrielle's stay in Australia was" to live [there]." (She also wrote that her and Gabi's departure date was March 3, 2008.) (See Pet. Hr'g Exh. 13, q.9).  She also wrote that the Children's immigration status was permanent. (See id., qq. 39, 65).  Kristina also checked "yes" to question 72: "Do you and your partner intend to maintain a lasting relationship?"

[54] (See Pet. Hr'g Exhs. 32 and 52 (discussed supra, n.42)).

[55] (See Pet. Exhs. 15-19 (various documents showing that Kristina researched and contemplated enrolling the Children and Gabi in school) and Exh. 20 (signed YMCA Activity Enrollment Forms).  While the parties dispute whether Gabi or the Children were technically "enrolled" in these activities, no tuition was paid, nor did anyone ever attend any classes. (See Tr., 130:14-133:1).

[56] (See Tr., 53:21-54:10).

threatened to kick her out of the house or have her arrested if she left with the kids,[57] and that she continued to solicit legal help during this time.[58]

On February 6, 2008, when the U.S. Embassy agreed to reissue the passports without Andrew's consent, Kristina left.[59] When Andrew discovered that neither Kristina nor the Children were home, he had the Family Court of Australia issue an ex parte order restraining Kristina "from removing or attempting to remove or permitting the removal of" the Children from Australia.[60] But by the time Order was issued, Kristina and the Children had already left Australia.[61]

Thereafter, Andrew proceeded to send a malicious e-mail from Kristina's G-mail account to everyone on her contact list, saying among other things that "[i]t is obvious now that she came to Australia not with the intention of repairing our marriage as she led me and everyone else to believe, but to have a free holiday, which was paid for entirely by me."[62]

Kristina phoned Andrew the day she returned home.[63] During the following week, Kristina and Andrew discussed an arrangement under which, *inter alia*, Kristina would permanently return to Australia with the Children, and the Maxwells would shared custody, although they would live separately.[64] When that arrangement never came to pass – Kristina filed for a domestic violence

---

[57] (See Tr., 270:9-11; see also Resp. Hr'g Exh. 24).

[58] (See Tr., 195:10-20; 235:1-19).

[59] (See Tr., 196:12-197:11).

[60] (See Pet. Aff., Exh. V).

[61] (See Pet. Aff., ¶ 42 (discussed *supra*, at n. 3, in regards to Andrew's credibility)).

[62] (Resp. Aff. Exh. 5). Andrew also maliciously revealed to Kristina's putative brother, Scott Richards, that he was actually Kristina's son whom she conceived when she was 13 years old. At the hearing, his explanations for doing this varied. (Compare Tr., 138:2 ("I believe[d] it was a story."); with 139:5-6 ("I think somebody who's in their 20's has a right to know the truth, any way."); see generally Tr., 138:14-139:6).

[63] (See Tr., 57:23-58:21).

[64] (See Pet. Hr'g Exh. 58: e-mail to Leah Georgakis ("The situation is that Kristina may sign a [l]egal [a]greement to return with the children giving us equal custody.")). Their discussion, however, far from amicable, demonstrates both Andrew's continued threatening behavior and his misuse of the legal system to gain custody of the Children. (See Pet. Hr'g Exh. 57 ("[E]ither agree to come here, there will be no charges filed against you. . . . The

13

protection order after Andrew threatened over the phone to kill her (and left messages for her kids calling her a drug addict)[65] – Andrew filed the instant Petition.

## III. ANALYSIS

The International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 et seq., implementing the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), entitles a person whose child has been wrongfully removed to or retained in the United States in violation of the Convention to petition a federal court to order the child returned. 42 U.S.C. § 11603(b).

The Convention is aimed at parties to custody battles – usually one of the parents – who either having lost, or expecting to lose, unilaterally removes a child to a country whose courts are preferred by that parent. Koch v. Koch, 450 F.3d 703, 712 (7th Cir. 2006); see also Elisa Perez-Vera, Explanatory Report, ¶ 11, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982) ("Perez-Vera Report") (noting that the Convention is designed to prevent "the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child.")).[66]  To discourage this sort of

___

instance is you have to come back here. Half custody 50/50. . . . [D]o whatever you do and then we can fight, in the meantime when your world comes crumbling down there will come a point when everything will probably get too much for you and I will go for custody.  You don't want that to happen. . . . And I will use that in Court too."); Pet. Hr'g Exh. 58: e-mail to Vanessa Jackson ("[A]fter I have reviewed [the legal agreement] and any changes made I will give you [Kristina's] e-mail address and you can e-mail it to her. . . . *My preference is that she doesn't see a solicitor*.") (emphasis added)).

[65] (See Resp. Hr'g Exh. 9; Ex parte DVPO; Tr., 208:23-209:20).  To the extent that Andrew denies having made threats (see Tr., 137:2-13), the Court finds Kristina's account on this matter credible. (See Tr., 207:24; 289:16-24).  Andrew admits calling Kristina a drug addict. (See Tr., 139:7-140:6 ("Her mother is a drug addict.")).

[66] Professor Elisa Perez-Vera was the official Hague Conference Reporter, and her report is generally recognized as "the official history and commentary on the Convention." Legal Analysis of the Hague Convention, 51 Fed. Reg. at 10,503.

international forum shopping, the Convention procedures are designed to have the court determine only whether the removal or retention was "wrongful," (i.e., in violation of the petitioner's rights of custody) under the law of the country in which the child has his or her "habitual residence," Hague Convention, Art. 3(a); 42 U.S.C. § 11603(e)(1)(A). The Conventino is not designed to settle the merits of the underlying custody dispute. <u>See</u> Hague Convention, Art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); <u>Holder v. Holder</u>, 392 F.3d 1009, 1013 (9th Cir. 2004) ("The Convention's focus is thus whether a child should be returned to a country for custody proceedings and not what the outcome of those proceedings should be.").

Here, to make his prima facie showing under 42 U.S.C. § 11603(b), Andrew must show that (1) the Children's habitual residence immediately prior to their removal was in Australia; (2) Kristina's removal of the Children breached his custody rights under Australian law; and (3) he was exercising those rights at the time of the removal. <u>See</u> <u>Miller v. Miller</u>, 240 F.3d 392, 398 (4th Cir. 2001) (citations omitted). If Andrew meets his burden, the ICARA requires that children be promptly returned unless Kristina can demonstrate that one of the five narrow exceptions set forth in the Convention applies; then mandatory return of the children becomes discretionary. 42 U.S.C § 11601(a)(4).

### A. The Children's Habitual Residence

The first matter the Court turns to is the question of where the Children's residence was "immediately prior to [removal.]" <u>See</u> <u>Feder v. Evans-Feder</u>, 63 F.3d 217, 222 (3d Cir. 1995).

Neither the convention nor the Act defines the term "habitual residence." As one British court observed, "[t]his has been a matter of deliberate policy, the aim being to leave the notion free

from technical rules, which can produce rigidity and inconsistencies as between legal systems." <u>See</u> <u>In re Bates</u>, No. CA122.89 at 9-10, High Court of Justice, Family Div'n Ct. Royal Court of Justice, United Kingdom (1989) (quoting Dicey & Morris, The Conflicts of Laws 166 (11th ed.)). Thus, while the Courts of Appeals that have considered the issue have employed somewhat different tests for habitual residence, consistent with Congress's recognition of "the need for uniform international interpretation of the Convention," 42 U.S.C. § 11601(b)(3)(B), each has held that it is to be interpreted based on the ordinary and natural meaning of these words, as a question of fact to be decided by references to all the circumstances of the particular case.[67]

Despite "the flexible, fact-specific nature of the habitual residence inquiry envisioned by the Convention," the question of how to determine the children's habitual residence remains. <u>Holder</u>, 392 F.3d at 1015. Although in some instance a court's attention may turn first and foremost to the child's perspective (<u>cf. Friedrich v. Friedrich</u>, 983 F.2d 1396, 1401 (6th Cir. 1993) ("[T]o determine the habitual residence, the court must focus on the child, not the parents.")), the Court finds that in this case – where there is a custody order in effect at the time and the record does not reflect a settled purpose from the Children's point of view – the analytical framework described in <u>Mozes</u> and <u>Holder</u> is the most appropriate for determining the Children's habitual residence.

The <u>Holder</u> court explained that the first step in acquiring a new habitual residence is the formation of a settled intention to abandon one's prior habitual residence. 392 F.3d at 1015 (citing

---

[67] <u>See</u>, <u>e.g.</u>, <u>Koch v. Koch</u>, 450 F.3d 703, 712 (7th Cir. 2006) (citing <u>Mozes</u>, 239 F.3d at 1071); <u>Gitter</u>, 396 F.3d at 134 (citing numerous cases); <u>Ruiz v. Tenorio</u>, 392 F.3d 1247, 1251-52 (11th Cir. 2004) (citing <u>Mozes</u>, 239 F.3d at 1071); <u>Whiting v. Krassner</u>, 391 F.3d 540, 547 (3rd Cir. 2004) (citing <u>In re Bates</u> and <u>Feder</u>, 63 F.3d at 223); <u>Silverman v. Silverman</u>, 338 F.3d 886, 898 (8th Cir. 2003); <u>Miller v. Miller</u>, 240 F.3d 392, 400 (4th Cir. 2001) (citing <u>Friedrich v. Friedrich</u>, 983 F.2d 1396, 1401 (6th Cir. 1993)); <u>see also</u>, Pérez-Vera, ¶ 66 (habitual residence is "a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile") (cited by <u>Koch</u>, <u>Gitter</u>, <u>Ruiz</u>, <u>Mozes</u>).

Mozes, 239 F.3d at 1075). Where the habitual residence of children is in question, especially those who are very young or are otherwise incapable of reaching their own decision regarding their place of residence, the Court first turns to the subjective intent of the parents. Holder, 392 F.3d at 1016 (citing Mozes, 239 F.3d at 1076); see also Feder, 63 F.3d 217, 224 (3d Cir. 1995) (looking to "the parents' present, shared intentions regarding their child's presence"). Although it begins with Kristina and Andrew's intent, the Court "do[es] not lose sight of the fundamental inquiry: the children's habitual residence. Parental intent acts as a surrogate for that of children who have not yet reached a stage in their development where they are deemed capable of making autonomous decisions as to their residence." Holder, 392 F.3d at 1016-17.

The parents' settled intention is not alone sufficient to change a child's habitual residence. The second step in acquiring a new habitual residence is a change in geography (i.e., the child must actually move), for an appreciable period of time that is "sufficient for acclimatization." Mozes, 239 F.3d at 1078; see also Feder, 63 F.3d at 224 ("[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective"). Importantly, however, "[h]abitual residence is intended to be a description of a factual state of affairs, and a child can lose its habitual attachment to a place even without a parent's consent." Id. at 1081 (emphasis omitted).

Here, it is clear that based on these standards the Children were habitual residence of the United States prior to their arrival in Australia on December 4, 2008. They were born and raised here for all four years of their lives and were acclimatized to their environment here in every way. The question before the Court, then, is whether their habitual residence changed from the United States to Australia to the United States prior to the removal date.

## 1. Kristina Never Intended to Abandon Her Habitual Residence In North Carolina

In general, where parents and children voluntarily move together under circumstances suggesting that they intend to make their home in a new country for the time being, whether of short or long duration, the Courts are likely to find a change in habitual residence despite the fact that one parent may have qualms about the move. Mozes, 239 F.3d at 1077. Where a family agrees to take up residence in a new country on a trial or conditional basis, however, courts have declined to find a change in habitual residence despite the potentially indefinite duration of the move. Papakosmas v. Papakosmas, 483 F.3d 617, 625-26 (9th Cir. 2007); Kijowska v. Haines, 463 F.3d 583, 588 (7th Cir. 2006); Ruiz, 392 F.3d at 1254; Gitter, 396 F.3d at 135; McKenzie v. McKenzie, 168 F. Supp. 2d 47, 54 (E.D.N.Y. 2001).

Difficulty arises, however, in cases such as this where the persons putatively entitled to fix a child's residence no longer agree on where it has been fixed. In this situation, the parents' representations cannot be accepted at face value, the Court must look at all available evidence to determine whether a joint settled intention can be inferred. Koch, 450 F.3d at 713 (citing Mozes, 239 F.3d at 1095).

Here, Andrew argues that Kristina never said that this was a trial move. It is clear, however, that the lines of communication between Andrew and Kristina had broken down by November, and that Kristina arrived in Australia with very different intentions and expectations than Andrew. While Andrew may have understood the relocation to Australia to be permanent, or at least indefinite, there is ample evidence to show that Kristina intended this to be a trial arrangement.

Andrew points to several instances in which Kristina stated that she (along with the Children and Gabi) was moving to Australia for permanent residency and took the steps necessary to do so

(i.e., she searched for houses and a car). (See generally, Petition, ¶ 19). Notwithstanding the fact that Kristina took most of these steps two months before she moved, much of this evidence is equivocal as these actions would be appropriate even if Kristina and the Children were planning on living in Australia temporarily, as per the Custody Order, or on a trial basis.

Andrew also places great weight on the fact that Gabi's classmates gave her letters wishing her luck with "her new life in Australia." The weight of these letters, however, is greatly undermined by Kristina's and Gabi's unrebutted testimony that Kristina sought permission from the school to miss the first portion of the spring semester. (Many of the statements also simply say "goodbye," "good luck," or "I will miss you." These types of statements would be appropriate whether the Gabi was moving to Australia on a permanent or a temporary basis.)

Thus, considering the totality of the evidence in the record, there is ample evidence to show that the move was made on a trial basis. While Kristina may have hoped for an antipodean reconciliation, she hedged by buying a round-trip ticket and traveling on an ETA, a three month tourist visa. Further, she left many of her possession behind at her mother's house, and kept her local bank account, credit card, and North Carolina Medicare. And, despite her financial needs, she also maintained the lease on her van, as well as the insurance. The fact that Kristina took these steps indicates that she intended that the family could return to life in the United States if she became disenchanted with life in Australia.

## 2. Kristina Never Formed an Intent to Abandon Her Habitual Residence In North Carolina After the Family's Arrival in Australia

The Court's finding that Kristina agreed to move to Australia on a conditional basis does not end the inquiry, however. "[O]ne need not have this settled intention [to abandon one's prior habitual

residence] at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary." Mozes, 239 F.3d at 1075. Here, however, there is little or no evidence that would support an inference that Kristina intended to abandon her habitual residence in North Carolina following the family's arrival in Australia. Although Kristina testified that she agreed to move to Australia to give the marriage "one last shot," it is clear that the couple's marital problems continued. The Maxwell's continued marital difficulties in Australia weighs heavily against a finding that they formed a shared settled intent to establish a new habitual residence after relocating to Australia. See, e.g., Ruiz, 392 F.3d 1255 (citing continued marital difficulties as evidence of a lack of settled purpose to abandon a prior habitual residence).

The evidence further shows that Kristina sought to return to the United States no later than January 15, 2008, five weeks after her arrival, but was unable to do so because Andrew had taken the Children's passports. Andrew's efforts to prevent Kristina from returning to the United States with the Children are strong indications that he was aware that Kristina did not share an intent to establish a habitual residence in Australia. See Prinz v. Faso, No. 03-6653, 2004 WL 1071761, *6 (W.D.N.Y. May 12, 2004) ("[T]he fact that Prinz concealed from Faso the location of his and Oliver's passports, in attempt to prevent them from returning to the United States using the original return tickets, is not indicative of a common or shared intent to establish a habitual residence in Germany."). And although Kristina putatively took steps to apply for permanent residency and looked into educational opportunities, she plausibly explained that she did so only because she felt that she had no choice after Andrew removed the passports, and threatened to kick her out of the house or have her arrested if she left with the kids. Given her clear desire to leave, as well as her explanation, the Court finds these putative steps are of little weight. See, e.g., Silverman, 338 F.3d

at 900 ("Habitual residence is not established when the removing spouse is coerced involuntarily to move to or remain in another country."); <u>Tsarbopoulos v. Tsarbopoulos</u>, 176 F. Supp. 2d 1045, 1055 (E.D.Wash. 2001) (father's intent to remain in foreign country concealed from mother and abuse of mother and children eliminated any choice in the move); <u>In re Application of Ponath</u>, 829 F. Supp. 363, 367 (D.Utah 1993) (habitual residence not acquired where mother and child were detained in forum against her desires for ten months by means of verbal, emotional, and physical abuse).

**3. The Facts Do Not Unequivocally Point to a Change in Habitual Residence**

The Court next considers whether the Children acclimatized to Australia prior to the date of removal and whether there was a degree of settled purpose from their perspective to remain in this country beyond February 6, 2008.

This approach considers a child's experience in and contacts with his surroundings, focusing on whether he became "firmly rooted" in his new surroundings, not merely whether he acculturated to a country's language or customs. <u>Holder v. Holder</u>, 392 F.3d 1009, 1019 (9th Cir. 2004); <u>see also</u> <u>Mozes</u>, 239 F.3d at 1078-79 (describing acclimatization as being "firmly embedded in the new country" or "being well-adjusted in one's present environment"); <u>Karkkainen v. Kovalchuk</u>, 445 F.3d 280, 292 (3d Cir. 2006) (holding that the inquiry is whether the child "develop[ed] a certain routine and acquire[d] a sense of environmental normalcy" by "form[ing] meaningful connections with the people and places [she] encountered" in a country prior to the retention date." (citing <u>Whiting</u>, 391 F.3d at 550-51)).  The question "is not simply whether the child's life in the new country shows some minimal 'degree of settled purpose,' but whether "child's relative attachments to the two countries have changed to the point where [failing to order the child's return] would now be tantamount to taking the child 'out of the family and social environment in which its life has

developed.'" Mozes, 239 F.3d at 1078-79 (quoting Perez-Vera Report, 111). Though the Court examines acclimatization and settled purpose "from the child's perspective," Feder, 63 F.3d at 224, parental intent is part of this inquiry because the child's knowledge of these intentions is likely to influence a child's ability to acclimatize. Mozes, 239 F.3d at 1079-80.

The courts have identified a number of specific factors that are highly suggestive of acclimatization and a degree of settled purpose from the child's perspective. These factors include school attendance; academic activities and lessons; friends and social engagements; participation in sports programs; and excursions in the child's new country. See Feder, 63 F.3d at 224 (noting that academic activities are among "the most central . . . in a child's life" and suggestive of acclimatization); Ruiz, 392 F.3d at 1255 (citing school attendance, social engagements, and taking lessons "as some evidence of acclimatization"); Holder, 392 F.3d at 1020 ("The older son was in the process of transitioning his life to Germany: He attended kindergarten, participated in sports programs, and accompanied his parents on various excursions both on and off the base"); Silverman v. Silverman, 338 F.3d 886, 890 (8th Cir. 2003).

Based on this standard, the Court finds little evidence in the record that the Children acclimatized themselves to Australia during their visit. The Children never attended school or Church, nor did they partake in youth activities or have friends in the community. Indeed, the evidence reflects that the Children spent virtually all of their time with their mother and socialized very little with anyone outside of the family. See Tsarbopoulos, 176 F. Supp. 2d at 1055. Moreover, despite the fact that the Children were "developmentally delayed," they did not have a therapist in Australia, nor is there evidence in the record that the Maxwells sought one, either before the Children left, or while they were in Australia.

Moreover, "[h]abitual residence may only be altered by a change in geography and passage of time." Silverman, 338 F.3d at 898. And where "circumstances are such as to hinder acclimatization, even a lengthy period . . . may not suffice." Mozes, 239 F.3d at 1078. Here, the Children were in Australia for two months. The Court finds no evidence to suggest that any special circumstances existed that would enable the Children to acclimatize quickly. In fact, given their mother's intention to return to the United States in March, the court should be " slow to infer . . . that an earlier habitual residence has been abandoned." Holder, 392 F.3d at 1020 (citing Mozes, 239 F.3d at 1079). Moreover, the fact that they were "developmentally delayed" suggests that they are not likely to acclimatize quickly, as does the fact that, during much of their stay in Australia, the Children's home was volatile.

Thus, the Court finds that these four- year old children were unlikely to be able to acclimatize to a new country under such circumstances. See Karkkainen, 445 F.3d at 294 ("Even a mature eleven-year old may not be able to acclimatize to a new country in "three months").

Thus, as there is no evidence of acclimatization, and the record does not reflect that the Children abandoned the United States as their habitual residence, or that there was a degree of settled purpose from their point of view,[68] the Court finds that, from the Children's perspective, Australia did not become their habitual residence prior to the date of removal.

---

[68] The only evidence that Children had become settled in Australia is the affidavits and testimony of Andrew's friends and relatives who, having observed the Children at a wedding on December 8, 2007 (two days after they arrived!), believe that the Children seemed "happy" in Australia. (See Pet. Hr'g Exh. 41: Adam Royle Aff. ("The kids were very happy living in Australia and they told me that they liked it here."); Exh. 43: John Maxwell Aff. ("Everybody looked happy and Kristina told me she was here to live."); Exhs. 46, 48, 49 (same)). This is insufficient. "The function of a court applying the Convention is not to determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life. . . . [Indeed] Children can be remarkably adaptable and form intense attachments even in short periods of time-yet this does not necessarily mean that the child expects or intends those relationships to be long-lived." Mozes, 239 F.3d 1079.

### 4.    Conclusion regarding habitual residence

Thus, the Court finds that the Children's habitual residence on February 6, 2008, was the United States. While the Petitioner has thus failed meet his burden on those grounds, there is an alternative basis for finding that he has failed to make his prima facie case.

## B. The Removal Was Not Wrongful Under Australian Law[69]

According to Article 3 of the Convention, Andrew must have been exercising rights of custody at the time of the wrongful removal. These rights include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, Art. 5(a). The Convention also recognizes "rights of access," but they are limited to "the right to take a child for a limited period of time to a place other than the child's habitual residence," id., Art 5(b), and the violation of them is not deemed wrongful removal. See Cantor v. Cohen, 442 F.3d 196, 200 (4th Cir. 2006) (stating that under the Hague Convention a petitioner "has no right to initiate judicial proceedings for access claims").[70]

Here, Andrew does not argue that the Custody Order was no longer valid in Australia. Indeed, he concedes that once it was properly registered in the Family Court of Australia, the Order "ha[d] the same force and effect as if it were an order made" by the Australian family court. (Duggan Aff., ¶¶ 15,16 (citing Part VII of Australia's Family Law Act 1975, Section 70H).

---

[69] In reaching its conclusion, pursuant to Federal Rule of Civil Procedure 44.1, the Court relied on both the report of the Petitioner's expert (see Pet. Hr'g Exh. 34: Aff. of Kym Duggan), and on the Respondent's expert, who both testified and offered a report (see Tr., 218:4-252:23; Resp. Aff. Exh. 5: Aff. of Peter Magee). See Fed. R. Civ. P. 44.1 ("In determining foreign law, [a court] may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on the law."). Having reviewed the expert evidence, where the experts differ, the Court adopts Mr. Magee's well-reasoned conclusions.

[70] Specifically, Article 5 provides that "a) 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence; b) 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence."

Rather, the basis of Andrew's argument is that the Australian Family Law Act operates to the effect that the Consent Order leaves him some residual shared parental responsibility. Specifically, Andrew notes that under the Family Law Act:

(1) under Section 61C, each parent is presumed to have parental responsibility for the child;

(2) Section 61D(2) provides that a custody order "does not take away or diminish any aspect of the parental responsibility . . . , except to the extent if any, as expressly provided for in the order; or necessary to give effect to the Order";

(3) pursuant to Section 61DA, the making of a parenting order triggers the application of a presumption that it is in the best interests of the child for each of the child's parents to have equal shared parental responsibility. That presumption must be applied unless there are reasonable grounds to believe that a parent or a person who lives with a parent has engaged in abuse of the child or family violence; and

(4) under Section 111B(4) parental responsibility equates to "rights of custody" for the purposes of the Convention.

(See Pet. Trial Br., pp. 15-16).

Andrew thus concludes that because the Consent Order did not literally abrogate his "equal shared parental responsibility," but rather found him to be a "fit person" to exercise visitation rights and mandated that he had input on certain (major decisions) decisions, he is presumed to retain shared parental responsibility for the Children and therefore had rights of custody under Article 5.[71]

The Court, however, finds that language of the order expressly removes any parental responsibility rights from Andrew such that any presumption of shared responsibility under Section 61DA does not apply. See Family Law Act, Section 61C, Note 1 ("This section states the legal position that prevails in relation to parental responsibility to the extent to which it is not displaced

---

[71] (See Pet. Trial Br., pp. 13-14 ("If a court allocates "parental responsibility" in any way between the parents, all major decisions for the long-term care and welfare of children must nonetheless be made jointly, unless the court expressly provides otherwise. Consequently, Australian law provided the [P]etitioner with far greater powers, rights and duties than stated in the [Consent Order].")); Duggan Aff., ¶¶ 17-19).

by a parenting order made by the court." (emphasis added)). To be sure, the Consent Order does not use the precise language of the Australian Family Law Act, i.e., it does not expressly refer to "parental responsibility." Nevertheless, if under Section 61D(2) one interprets the Consent Order according to its natural meaning, it clearly leaves Andrew without any shared parental responsibility.[72] As Mr. Magee aptly described, "the North Carolina order covers the field effectively in relation to parental responsibility, even though it doesn't use that express term." (See Tr., 227:10-20). Contrary to Mr. Duggan's conclusion, the visitation provisions, that Andrew shall be allowed to have "input" on all major decisions or the 90-day advance notice provision, do not give him sufficient parental rights. While Kristina is required to discuss certain matters with Andrew, she nevertheless has the final say; there is no requirement that she and Andrew "make a genuine effort to come to a joint decision." See, e.g., Section 65DAC(3)(b). Indeed, it would be an unreasonable interpretation of the Family Law Act to insist that a North Carolina Court use the terms "equal shared responsibility" or "shared responsibility" in its order. Thus, pursuant to Section 61(1), Note 1, any presumption of shared responsibility is thus displaced by the registered Consent Order.

Because the Court finds that under Australian Law the Consent Order explicitly gave Kristina sole custody of the Children, Andrew has failed to meet his burden of proof that he had rights of custody.

## IV. CONCLUSION

The object of the Hague Convention is to discourage parents from engaging in gamesmanship with their children's upbringing in order to secure an advantage in an anticipated custody battle.

---

[72] (See Pet. Hr'g Exh. 4: Consent Order ("[The Mother] is a fit and proper person to have *the permanent care, custody and control* of the parties' minor children and it is in the best interests of the minor children that their permanent care, custody and control be placed with [her]." (emphasis added)), *supra*, n. 10).

Petitioner seeks not the restoration of the status quo, but its alteration. To allow Petitioner's use of the Convention in this manner – rendering nugatory a child custody result rendered in an action he previously initiated in one country, in the hopes of obtaining a more favorable result in a second country - contravenes the Convention's salutary aim of discouraging forum shopping.

**THEREFORE, IT IS HEREBY ORDERED** that the Petition (Doc. No. 1) **BE DISMISSED** and judgment **ORDERED** for the Respondent. It is **FURTHER ORDERED** that each party is to bear its own costs.

Signed: September 2, 2008

Robert J. Conrad, Jr.
Chief United States District Judge